William D. BLODGETT and Florence G. Blodgett, his wife, Plaintiffs and Appellants,

v.

Joe MARTSCH, Betty Purcell, aka Betty Purcell Martsch, Doyle Nease, Raco Car Wash Systems, Inc., a Utah corporation, Wayne A. Ashworth, Trustee, Karl W. Tenny, Valley Bank & Trust Company, a Utah banking corporation, First Security Bank of Idaho, N.A., State of Utah and John Does 1 through 10, Defendants and Respondents.

No. 15608.

Supreme Court of Utah.

Dec. 26, 1978.

Joseph Rust of Kirton, McConkie, Boyer & Boyle, Salt Lake City, for plaintiffs and appellants.

Harry D. Pugsley, Donald Sawaya, Irving H. Biele, Lorin N. Pace, John P. Ashton, Salt Lake City, for defendants and respondents.

MAUGHAN, Justice:

The Blodgetts here appeal from summary judgment of no cause of action on their complaint alleging fraud in transactions which culminated in the public sale of the Blodgetts' property at a price allegedly about one-eighth its appraisal or actual value. The public sale was effected pursuant to a trust deed. The Blodgetts allege they were unaware the major part of the property so sold was included in the trust deed description, and their ignorance is attributable to the trustee's misrepresentation and breach of duty to inform them about the contents of the deed.

In reviewing the record on any appeal from summary judgment, we treat the statements and evidentiary materials of the appellant as if a jury would receive them as the only credible evidence, and we sustain the judgment only if no issues of fact which could affect the outcome can be discerned. Viewed in that light, the record supports the following statement of facts.

In 1969, the Blodgetts were the owners of two tracts of land located at approximately 6100 South on Highland Drive in Salt Lake County. On the larger tract (the "store tract") they operated a grocery store. The smaller tract "car-wash tract") was adjacent to the store tract and was not utilized by the Blodgetts until they leased it to Raco Car Wash Systems, Inc. ("Raco") for the installation of a car wash facility in early 1969. The lease instrument provided that the Blodgetts would permit the car-wash tract to be pledged as security for a loan Raco required to finance the car wash installation.

Raco, acting through its president, Betty Purcell, made arrangements for the loan with Respondent Valley Bank & Trust Company (the "Bank") with which the Blodgetts had a significant previous business history as borrowers and depositors.

On November 5, 1971, at about 5:30 p. m. the Blodgetts attended the Raco loan closing at the Bank's office. They intended to execute documents necessary for the hypothecation of the car-wash tract alone, although they recognized an access easement over the store tract was involved. The only commitment the Blodgetts had made until the moment of closing was the one contained in the Raco lease instrument, of which the Bank had a copy. Without the Blodgetts' knowledge, the Bank had advised Raco it required stronger security than the car-wash tract alone, had been advised by Raco the Blodgetts would pledge the store tract as well, and had prepared for the Blodgetts' execution a trust deed which conveyed both the car-wash tract and the store tract. In addition, without first discussing the matter with either Raco or the Blodgetts, the Bank had prepared a note for signature by the Blodgetts as co-makers, even though the Blodgetts' signature on the note was not necessary to satisfy any internal requirement of the Bank or any external requirement of regulatory authority.

Although the Bank usually explained loan documents to borrowers unless they demonstrated some degree of sophistication, the Bank in this case offered the Blodgetts no explanation of the trust deed contents and, in particular, failed to call attention to the trust deed's departure from the concept of the Raco-Blodgett lease. Bank personnel

spent some half hour explaining the loan documents to Ms. Purcell (although neither she nor her corporation was making any contribution to the real property collateral), but made no similar effort to inform the Blodgetts. This was so even though the Blodgetts announced they did not understand the loan documents. When the Blodgetts asked about the note, the Bank falsely advised them they assumed only a secondary or "stand-by" obligation by signing it. The Blodgetts requested copies of all the loan documents, but the Bank sent them a copy of the note only.

Raco defaulted on the secured note. After the loan was consummated, but before the trustee undertook sale of the Blodgett tracts, the Blodgetts satisfied (by $20,000.00 prepayment) a loan which was secured by the store tract and which predated the Raco loan. The Bank did not then call the Blodgetts attention to a remaining encumbrance on the store tract or suggest the tract was in jeopardy.

By the time proceedings were instituted for public sale of the Blodgett tracts, Respondent Wayne Ashworth had been substituted for the Bank as trustee. The substitution was effected in compliance with statute and with actual notice to the Blodgetts. There is no showing that Ashworth knew of the non-disclosures of the Bank, or of its unauthorized inclusion of the store tract, in the trust deed.

In effecting the public sale of the Blodgett tracts, Ashworth failed to comply with the statute (Section 57–1–25) which prescribes the procedure for public notice. Both the published and posted notices failed to identify the property in that two calls were omitted from the description, and only two of the notices were posted in the precinct where the tracts lie.

The Blodgetts were present at the public sale and so were Ashworth and the Bank. In the course of the sale proceedings, the Blodgetts, by reason of their misconception that only the car-wash tract was subject to sale, failed to take the most elementary

kinds of self-interest action. For example, although our statute (57–1–27) requires the trustee, where two or more tracts are being sold under a trust deed, to follow the trustor's direction with regard to joint sale or sequential sales of the tracts, the Blodgetts did not request the sale of the car-wash tract (which alone had a value in excess of the secured debt) as a first and separate transaction. Moreover, the Blodgetts did not enter the bidding for the combined tracts even though the high bid was a barely significant fraction of their value. Neither Ashworth nor the Bank consulted with, advised, or sought instruction from the Blodgetts before or during the public sale. Both acted purely in the Bank's interest and took the course of action most likely to assure that the Bank would either be paid in full or acquire the tracts at a bargain price. The high bidder at the public sale was Respondent Joe Martsch. Martsch had been a director of Raco (now defunct) during its operative years, and was married to Betty Purcell at the time of the sale.

The deed by which Ashworth conveyed the Blodgett tracts to Martsch falsely recited that all statutory requirements for public sale had been satisfied. Martsch in fact paid $30,000 for the deed. The Blodgetts first became aware that the store tract had been included in the sale when Martsch asserted his rights of ownership after the sale.

■ The Blodgetts first seek relief against the Bank and Ashworth on the basis of fraud and abuse of confidential relationship. The elements of a fraud action have frequently been stated by this Court.[1] The plaintiff must, in the absence of confidential relationship, prove the defendant knowingly misrepresented a material fact with intent to induce the plaintiff to act or refrain from action and that the plaintiff, reasonably relying on the misrepresentation, acted (or failed to act) to his detriment.

1. *Stuck v. Delta L & W Co.,* 63 Utah 495, 227 P. 791; *Guaranty Mtg. Co. v. Flint,* 66 Utah 128, 240 P. 175.

■ If the circumstances are such that the defendant could exercise extraordinary influence over the plaintiff and the defendant was or should have been aware the plaintiff reposed trust and confidence in the defendant and reasonably relied on defendant's guidance, then the parties are said to be in "confidential relationship" and the plaintiff's burden is considerably diminished. "A course of dealing between persons so situated is watched with extreme jealousy and solicitude, and if there is found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party." [2]

■ Whether litigants were in confidential relationship at the time of the transactions about which they litigate is ordinarily a question of fact and is not to be found on the basis of mere friendship or social or religious affiliation between the parties.[3] There are a few relationships (such as parent-child, attorney-client, trustee-cestui) which the law presumes to be confidential. The relationship which arises when a borrower secures his loan by trust deed has been the subject of considerable judicial comment. Among cases which have declared the trustee under a deed of trust to be in fiduciary relationship with the trustor are *Furst v. Loftin,* 29 N.C.App. 248, 224 S.E.2d 641 (1976), *Spires v. Edgar,* 513 S.W.2d 372 (Mo.1974), *Woodworth v. Redwood Empire Savings & Loan Assn.,* 22 Cal.App.3d 347, 99 Cal.Rptr. 373 (1971), and *Feldman v. Rucker,* 201 Va. 11, 109 S.E.2d 379.

■ The duty of the trustee under a trust deed is greater than the mere obligation to sell the pledged property in accordance with the default provision of the trust deed instrument, it is a duty to treat the trustor fairly and in accordance with a high punctilio of honor. In discussing the difference between the duties of a mortgagee and the trustee under a trust deed, the Court of Appeals of District of Columbia in *Spruill v. Ballard,* 61 App.D.C. 112, 58 F.2d 517, made this statement:

The practice of securing money by deed of trust on real estate is the nearly universal method in effect in the District of Columbia. The ease and facility of foreclosure under it commends it over the more cumbersome form of mortgage which must be foreclosed in court, but this very fact imposes upon courts the duty of scrutinizing all sales had under it which are questioned, and of setting those aside in which fraud or overreaching has been practiced by the trustee. In *Church Inv. v. Holmes,* 60 App. D.C. 27, 46 F.2d 608, we said a trustee named in a deed of trust to secure a loan sustains a fiduciary relation to the debtor as well as the creditor, . . .

■ The breach of duty by the dominant party in a confidential relationship may be regarded as constructive fraud. It is unnecessary for the plaintiff to show an intent to defraud; constructive fraud is an equitable doctrine employed by the courts to rectify injury resulting from breach of the obligations implicit in the relationship.[4]

■ In this case, there is more upon which to predicate confidential relationship between the Blodgetts and the Bank than the mere utilization of trust deed in the loan transaction. The Blodgetts had been long time customers of the Bank and had previously borrowed on the security of the store tract. They were not strangers at the Raco loan closing. Finally, there is room for inference that trust companies, if they use the trust deed mechanism with *no* intent to be protective of borrowers, exploit the euphoria engendered by the word "trust." The statute permits only entities with credentials of trustworthiness to act as "trustees," [5] and the instrument of transfer is denominated a "trust" deed. It may not be generally understood by those who con-

---

2. 37 Am.Jur.2d 38, Fraud and Deceit, § 15.

3. *Thatcher v. Peterson,* 20 Utah 2d 290, 437 P.2d 213.

4. *Carnes v. Meador,* 553 S.W. 365 (Tex.1975); *Vogt v. Town & Country Realty of Lincoln,* 194 Neb. 308, 231 N.W.2d 496 (1975).

5. 57–1–21, U.C.A., 1953 as amended.

vey by trust deed that the only entity to which the trustee feels fiduciary obligation is itself.

The Bank, in seeking summary judgment, asserted that none of its personnel made any representation, false or otherwise, about the content of the trust deed the Blodgetts signed. Any claimed false representation related to the nature of the obligation the Blodgetts assumed, by signing the note, and is not material, because the public sale of Blodgetts' property would have taken place in the same way if the Blodgetts had never signed the note in any capacity.

We cannot agree the Bank's silence about the trust deed's contents at the Raco loan closing, at the time of the prepayment of the first Blodgett loan, and at the time of the public sale constituted a discharge of the Bank's duties as a matter of law if the facts are indeed as the record would permit a jury to find. Reasonable diligence on the part of a trustee, where the trustor proclaims his confusion about the meaning of the instruments he is asked to sign, may require a full disclosure and explanation, particularly where the instruments impose a heavier burden than trustor-signed documents in the trustee's hands authorize. We have already noted the other occasions when the Bank may have had a duty to speak.

As to Respondent Ashworth, his duty to the Blodgetts after he became trustee was to act with reasonable diligence and good faith on their behalf consistent with his primary obligation to assure the payment of the secured debt. He had certain clear statutory duties with regard to (1) advertisement of the sale (Sec. 57–1–25) and (2) deference to the Blodgetts' preference as to the joint or sequential sale of the tracts (Sec. 57–1–27). It can hardly be said that Ashworth satisfied those obligations as a matter of law. The only evidence in the record is that he failed to post sale notices where required, that the posted notices mis-described the tracts, and that he did not inquire as to the Blodgetts' preference about joint or sequential sale, let alone defer to that preference.

Our statutes protect a bona fide purchaser at a public sale under a trust deed, by permitting him to rely on the recitals in the deed he receives from the trustee after the sale. Such a sale cannot be set aside because of irregularities in the publication or posting of notice.

Ashworth may satisfy a jury that he acted appropriately. On the record before us however, there is an issue of fact whether Ashworth exercised reasonable diligence to protect the trustor's interests in the procedures incident to the public sale.

As to defendant Martsch, the evidence before us does not lead to the conclusion he qualified as a bona fide purchaser, so as to be entitled to rely on the recitals of the deed issued by the trustee; after the public sale. A bona fide purchaser is one who takes without actual or constructive knowledge of facts sufficient to put him on notice of the complainant's equity.[6]

The end result of the legal maneuvers in this case is that a Raco insider, for merely satisfying a debt which was primarily Raco's now claims, free of any Blodgett equity, the proceeds from condemnation of the car wash tract by the State of Utah (and such proceeds exceed the price paid at the sale), and further claims the store tract which has significantly greater value. We cannot agree that Martsch, by virtue of his association with Raco and Purcell, could not be found to have had at least constructive knowledge of the fact that the Blodgetts were unaware the store tract was being sold.

While the transfer to the State of Utah as the result of condemnation cannot now be set aside, the equitable remedies associ-

---

6.  *Orso v. Cater*, 272 Ala. 657, 133 So.2d 864; *Sieger v. Standard Oil Co.*, 155 Cal.App.2d 649, 318 P.2d 479.

ated with unjust enrichment [7] are not foreclosed to the Blodgetts as against Martsch on the facts revealed by the record, nor is restoration of the Blodgetts' title to the store tract beyond the court's powers if title is found not to be in a bona fide purchaser.

Summary judgment being inappropriate on the state of the record, the matter is remanded for trial as against Martsch, Ashworth, and the Bank. With regard to the Blodgetts' action against the State of Utah, however, summary judgment is affirmed. Discovery has revealed no basis for confidential relationship between the Blodgetts and the State or for questioning the State's bona fides or for a finding that the State has been unjustly enriched.

ELLETT, C. J., concurs in result.

CROCKETT, J., concurs by separate opinion.

HALL, J., concurs with reservation by separate opinion.

CROCKETT, Justice (concurring):

I concur with the main opinion and also with the comments of Justice Hall: that we should not presume to evaluate nor draw conclusions from the evidence, but that should be done at the trial.

HALL, Justice (concurring with reservation):

Summary judgment is a ruling of the court as a matter of law and is only appropriate when no genuine issue of material fact exists.

I agree that summary judgment was not proper in this case because of the existence of the various issues of fact noted in the main opinion that may only be determined by a fact-finder. Consequently, I concur in reversing and remanding for trial on the issues that exist with respect to the claim of Martsch, Ashworth and the Bank.

It being the prerogative of the fact-finder to hear the evidence, make findings of fact, and draw inferences and conclusions of law therefrom to support its judgment, I do not adopt the "statement of facts" set forth in the main opinion except to the extent necessary to support the Court's conclusion that *issues of fact* are present requiring a trial.

WILKINS, Justice, concurs in the views expressed in the concurring opinion of HALL, J.

---

7. 66 Am.Jur.2d 945, Restitution and Implied Contracts, Sec. 3, Restatement of Restitution, Sec. 1 et seq.